UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

In re                                                                      Chapter 7

JOHN O'DONNELL AND ELLEN                          Case No. 09-15014
O'DONNELL,
                              Debtors.
-----------------------------------------------------------x
JOHN O'DONNELL AND ELLEN
O'DONNELL,
                              Plaintiffs,
                    -against -                                    Adv. Pro. No. 09-01486
INTERNAL REVENUE SERVICE,
NEW YORK STATE DEPARTMENT OF
TAXATION AND FINANCE, AND THE
STATE OF NEW JERSEY,
                              Defendants.
-----------------------------------------------------------x

## MEMORANDUM OF LAW IN OPPOSITION TO IRS MOTION FOR SUMMARY JUDGMENT, AND IN SUPPORT OF DEBTORS' MOTION FOR SUMMARY

John and Ellen O'Donnell (the "Debtors" or "Plaintiffs"), as and for their

Memorandum of Law in Opposition to IRS Motion for Summary Judgment, and in Support of

Debtors' Motion for Summary, respectfully represent as follows:

**(a)** **the Debtors are entitled to a discharge because their conduct and mens rea is inconsistent with tax evasion,**

**(b)** **The Debtors' paid 75% of their taxes when due, while maintaining a relatively modest lifestyle,**

**(c)** **The Debtors did not willfully underpay their taxes since they believed that withholding tax would cover their tax liability,**

**(d)** **Although the IRS cites the one-day-late rule, the IRS does not support the one-day-late rule, and this Court should reject the rule as well,**

**(e)** **The IRS right to payment accrued when the taxes became due, not when the IRS formally assessed the debt, and**

**(f)** **This court should follow the line of cases which continues to apply the Beard test and conclude that Debtors' late returns constitute tax returns under the Bankruptcy Code.**

## SUMMARY JUDGMENT STANDARD

1.　　Federal Rule Civil Procedure 56(c), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, governs summary judgment motions. Under the Rule, the Court will grant judgment if the submissions show that no genuine material issues of fact exist and the movant is entitled to judgment as a matter of law. *Accord, Cargill, Inc. v. Charles Kowsky Resources, Inc*., 949 F. 2d 51, 55 (2d Cir. 1991); *In re Maxwell Newspapers, Inc.,* 151 B.R. 63, 67; (Bankr. S.D. N.Y. 1993); *Shugrue v. Pension Benefit Guar. Corp. (In re Ionosphere Clubs, Inc.)*, 147 B.R. 855, 860 (Bankr. S.D. N.Y. 1992). If the movant carries the initial burden of demonstrating the absence of genuine factual issues, the nonmoving party cannot rely on pleadings or mere denials, and must set forth specific facts that show triable issues. *In re Masterwear Corporation, et. al. (Masterwear, et. al. v. Angel Frankel, P.C.*), 233 B.R. 266, 272 (Bankr. S.D. 1999) referring to Fed. R. Civ. P. 56(e) and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, (1986). The nonmoving party must show there is more than a metaphysical doubt regarding a material fact, *In re Masterwear Corporation, et. al*, 233 B.R. at 272 (*citing Matsushita Elec. v. Zenith* 475 U.S. at 586; *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 246 (2d Cir. 1993), and may not rely solely on self-serving conclusory statements. *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2dCir.1993); *Wyler v. U.S*., 725 F. 2d 156, 160 (2d Cir. 1983). "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. at 586). The non- moving party cannot survive a properly supported motion for summary judgment by resting on his pleadings "without offering 'any significant probative evidence tending to support the complaint.'" *Anderson v. Liberty*

2

*Lobby, Inc.*, 477 U.S. 242, 249) (*quoting First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290 (1968)).

## **STATUTORY FRAMEWORK**

2.      Section 727(b) of the Bankruptcy Code provides for the discharge of an individual chapter 7 debtor's prepetition debts unless such debts are excepted from discharge under 11 U.S.C. § 523.

3.      Section 523(a)(1)(C) excepts from discharge any tax debt "with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax [.]" Defendant has not alleged Plaintiffs made a fraudulent return. Therefore, the first question is whether Plaintiffs willfully attempted to evade or defeat a tax.

4.      The second question raised by the Defendant is whether Plaintiffs filed tax returns more than three years prior to filing their Chapter 7 petition. Section 523(a)(1)(A) excepts from discharge debt[s] from taxes of a kind described in section 507(a)(8). Section 507(a)(8), in turn, gives priority to income taxes "for which a return, if required, is last due, including extensions, after three years before the date of the filing of the petition."

## **BURDEN OF PROOF**

5.      The IRS has the burden of proof; and the standard is by a preponderance of the evidence. *E.g. Grogan v. Garner*, 498 U.S. 279 (1991).

6.      To effectuate the "fresh start" policy of the Bankruptcy Code, exceptions to discharge should be strictly construed against the creditor and liberally in favor of the debtor.

*See Snoke v. Riso (In re Riso),* 978 F.2d 1151, 1154 (9th Cir.1992). *In re Morris*, 223 F.3d 548

(7th Cir. 2000).

## THE DEBTORS ARE ENTITLED TO A DISCHARGE BECAUSE
## THEIR CONDUCT AND MENS REA IS INCONSISTENT WITH TAX EVASION

7.      Willful tax evasion under Section 523(a)(1)(C) has two elements: (a)

conduct constituting an attempt to evade or defeat taxes, and (b) *mens rea* or "willfulness."

*Tudisco v. United States (In re Tudisco)* 183 F.3d. 133 (2d. Cir. 1999).

**(a) The Debtors' paid 75% of their taxes when due, while maintaining a modest lifestyle**

8.      On the conduct element, the Debtors overpaid their taxes for tax year 2003

when due, paid 98% of their taxes for 2001 when due, and overall, paid $353,000 of $468,000

due, which equates to 75% of the taxes due for the period 1997 through 2003. Cowart Affidavit,

Exhibits 4-10 For the entire pre-petition period of 1994 through 2008 which the IRS has included

in the Cowart affidavit, the Debtors paid $1,036,000 of $1,160,000 of tax due which equates to

89% of tax due for that pre-petition period. Cowart Affidavit, Exhibits 4-15. Based on these

undisputed facts, the Debtors respectfully submit that since they paid the vast majority of the

taxes due when due, they were not engaged in *conduct* constituting an attempt to evade or defeat

taxes.

9.      Admittedly, the Debtors' tax returns for these years were filed after they

were due, but failing to timely file returns should not carry much weight, let alone be the

controlling element under section 523(a)(1)(C) on conduct. As pointed out by the leading treatise

on bankruptcy, the rules and consequences of late filing are covered separately in section

523(a)(1)(B). *See 4 Collier on Bankruptcy,* para. 523.07[4] (Matthew Bender, 2015).

4

10.    The undersigned could find no reported case, nor did the IRS cite any case, where the IRS attempted to deny a discharge on tax evasion grounds, let alone prevailed, where a taxpayer merely underpaid 25% of the amount due for the period.

11.    In summary, since the Debtors' conduct during the discharge period, and for the entire pre-petition period cited by the IRS, indicates no attempt to evade taxes, the Debtors are entitled to summary judgment.

**(b) The Debtors did not willfully underpay their taxes since they believed that withholding tax would cover their tax liability**

12.    On the willfulness element, as stated by *Tudisco,* "The *mens rea* requirement of § 523(a)(1)(C) mandates that the debtor's conduct be undertaken 'voluntarily, consciously or knowingly, and intentionally.' *Dalton,* 77 F.3d at 1302*; see also In re Bruner,* 55 F.3d at 197*; In re Toti,* 24 F.3d at 809." In *Tudisco,* the Court found that the willfulness element was satisfied because the Debtor manipulated his withholding exemptions to avoid taxation, and then at trial expressed the belief that he had no obligation to pay based on tax protestor arguments, which contradicted his previous admission that he knew he must pay taxes.

13.    Here, the Debtors never denied their obligation to pay taxes. They permitted a portion of their wages to be withheld, and they believed that the withholding taxes would cover their obligations. O'Donnell Affidavit, Cowart affidavit, exhibits 31, 333, 42. They were correct in that assumption for years 2001 and 2003, two of the years under consideration. Cowart Affidavit, Exhibits 8 and 10.

14.    Following the lead of the Supreme Court and legislative history instructing that the dischargeability rules must be applied liberally in favor of the debtor to give the honest

5

but unfortunate debtor a fresh start, virtually all of the reported case law on willfulness involves

total or almost total non-payment coupled with a luxury lifestyle and/or a prior criminal tax

evasion conviction. The Courts have even excused spending on luxuries where, as here, the debtor

believed taxes were being paid. *In re Storey,* 640 F.3d 739, 744 (6th Cir. 2011); *In re Looft*, 533

B.R. 910 (Bankr. N.D. Ga. 2015).

15.     This case is unique. It does not involve either a criminal tax evasion

conviction or spending on luxury cars, luxury vacations, luxury material goods, luxurious

restaurants, country clubs, summer homes, elite private schools, and boats. Here, the Debtors

spent nothing on such things. They made relatively good money, but they lived in Manhattan,

where a middle-class lifestyle is relatively expensive. When they discovered their underpayment,

the Debtors retained a tax lawyer, followed his advice to the letter, rented a less expensive

apartment and liquidated all their retirement and children's education funds to pay taxing

authorities. O'Donnell Affidavit; Debtors Statement of Undisputed Facts, Ex. A.

16.     Against this background, the IRS admits no difference between the

debtors with their 75% payment history, middle class lifestyle and prompt liquidation of assets on

the one hand, and the reported cases on the other hand involving total or almost total non-

payment, criminal tax evasion convictions, devious tax evasion schemes, and luxury lifestyles.

17.     For example, the only cases the IRS cited to support tax evasion based on

the Debtors' 25% shortfall between withholding tax and actual tax due were the following: *In re*

*Toti*, 24 F.3d at 809 (tax evasion finding based on prior criminal tax evasion conviction and

sentence); *In re Fretz*, 244 F.3d 1323, 1329 (11th Cir. 2001) (No taxes paid for 10 years and

criminal tax evasion conviction) *In re Colish*, 289 B.R. 523, 533 (Bankr. E.D.N.Y. 2002) (tax

attorney made token payments for many years while concealing assets); *In re Fernandez*, 112

B.R. 888, 892 (Bankr. N.D. Ohio 1990) (Criminal conviction for tax evasion, followed by failure

to pay in violation of parole); *In re Lewis*, 151 B.R. 140, 142 (Bankr. W.D. Tenn. 1992) (Case

involving Jerry Lee Lewis, who asserted Fifth Amendment privilege on financial issues, hid cash

in his bathroom, and fraudulently conveyed residence); *In re Gardner*, 360 F.3d 551, 56 (6th Cir.

2004) (debtor was a lawyer who concealed assets from the IRS and Bankruptcy Court, by using

his escrow account for personal expenses, placing funds in his secretary's name and in his wife's

maiden name, concealing a $500,000 fee, and diverting another $170,000 fee previously allocated

to the IRS, all the while living a "profligate" lifestyle including "golfing junkets throughout the

United States, vacations to Europe and the Caribbean and the yearly expenditure of over $25,000 to

maintain his country club memberships.").

18.    Here, when instructed by their tax attorney to liquidate their assets to pay

taxes, Ellen O'Donnell cashed in the $40,000 savings bond account with Morgan Stanley she had

saved for the children's education. Since she had no bank account at the time, she placed the

money in her adult son's bank account pending instructions from tax counsel on where the funds

should be sent. But for many months, tax counsel never got around to instructing her where to

send the funds. Meanwhile, her son, who had temporarily moved out of the apartment spent

$20,000 of the $40,000, (not on luxuries, but on basic living expenses), without the Debtors

knowledge or consent. The rest of the $40,000 was paid to taxing authorities. O'Donnell

Affidavit; Cowart Affidavit Exhibits 31, 33, 42. The only cases the IRS cited to equate this

situation with tax evasion were: *In re Jacobs*, No. 03-07148BKC3P7, 2006 WL 2691516 (M.D.

Fla. Sept. 19, 2006) (country club lifestyle, $20,000 spent on plastic surgery, numerous fraudulent conveyances to wife, children and charities); *In re Griffith*, 206 F.3d 1389, 1396-97 (11th Cir. 2000) (debtor transferred profitable business to girlfriend); *United States v. Sumpter*, No. 94-1440, 1995 WL 501947, at *2-5 (6th Cir. 1995) (Debtor was a lawyer who admitted that he transferred six parcels of real property to a trust to avoid taxes); *In re Peterson*, 317 B.R. 556, 566 (Bankr. N.D. Ga. 2004) (Lavish lifestyle featuring shopping sprees at Bloomingdales, Neiman Marcus, and Lord & Taylor, fine dining, expensive entertainment, luxury vacations, refusal to disclose assets to IRS, and default on IRS payment plan requiring only $150.00 per month); *In re Hassan*, 301 B.R. 614, 619–24 (S.D. Fla. 2003) (yearly trips to India, undisclosed Indian bank accounts, cash dealings, intra family transfers, and luxury lifestyle).

19.      *Sumpter* is notable for the additional reason that since Mrs. Sumpter had no involvement in her husband's transfer of the real property, she received her discharge. Here, John O'Donnell's uncontradicted testimony indicates that he had no knowledge until after the fact of Ellen O'Donnell's transfer to her son, and her son's later use of $20,000 for living expenses. Even if the Court finds that Ellen attempted to evade taxes, discharge should only be denied as to Ellen.

20.      In addition, since Ellen is deceased her statements upon which the IRS relies are inadmissible as hearsay.

21.      In support its argument that Debtors exhibited the *mens rea* necessary to establish tax evasion, the IRS highlights Dr. O'Donnell's liquidation of his retirement savings. The IRS admits that he transferred the funds to tax counsel. The IRs admits that tax counsel used the funds exclusively to pay the Debtors' tax obligations. The IRS equates this conduct with tax

evasion by citing the following cases: *Matter of Birkenstock*, 87 F.3d at 951 (tax evasion conviction and "sweeping" conveyances of house and securities to a trust to shield them from taxing authorities); *In re Gardner*, 360 F.3d at 559 (debtor was a lawyer who concealed assets from the IRS and Bankruptcy Court, by using his escrow account for personal expenses, placing funds in his secretary's name and in his wife's maiden name, concealing a $500,000 fee, and diverting another $170,000 fee previously allocated to the IRS, all the while living a "profligate" lifestyle including "golfing junkets throughout the United States, vacations to Europe and the Caribbean and the yearly expenditure of over $25,000 to maintain his country club memberships.").

22.    After Ellen's bank accounts were seized by taxing authorities, she either closed her bank accounts or stopped using them. She cashed her paychecks upon receipt and used the money to pay for groceries and similar expenses. She gave the IRS detailed breakdowns of these cash expenditures in the Debtors' applications for instalment plans and offers in compromise. The IRS cites the following cases to equate this conduct with tax evasion: *In re Hamm*, 356 B.R. 263, 276 (Bankr. S.D. Fla. 2006) (Luxury lifestyle, concealed assets, fraudulent conveyances, and cash unaccounted for); *In re Lynch*, 299 B.R. at 76 (Court found debtor not "honest but unfortunate" based on her status as a financial professional married to a financial professional who did not disclose non-debtor spousal contributions, made monthly luxury trips to California or China, vacationed in Paris, enjoyed luxury restaurant dining four nights a week, spent an additional $18,000 per year for holistic food, and made $20,000 per year contributions to the Church of the Movement of Spiritual Inner Awareness in California).

23.    When asked by tax counsel how much they believed they could afford on a monthly installment plan, the Debtors responded $3,500 to $4,000 per month. Tax counsel then

opened negotiations with the IRS without involving the Debtors. Debtors' Counsel's opening

offer to the IRS was $1,500 per month. The IRS shut down all attempts at *any* monthly payment

plan in the mistaken belief that the Debtors could pay their entire obligation from liquid assets.

Revenue Officer notes indicate that the Revenue Officer believed the Debtors were clueless as to

their attorney's conduct. Cowart Affidavit, Ex. 26, p. US000530.

24.     As examples of the Debtors' unjustified excessive spending, the IRS faults

the Debtor for not moving out of their $5,540 per month apartment sooner, apparently rejecting

the Debtors' explanation that tax liens had destroyed their credit rating, and that it took years to

find a $3,000 per month apartment for a family of five that would accept them as tenants. The IRS

also complains of $372 per month for two children to attend Catholic school, $179 per month for

movies, $33 per month for video games, and $32 per month for a New York Times subscription.

In support, the IRS cites *In re Lynch*, 299 B.R. 62, 82 (Bankr. S.D.N.Y. 2003), *aff'd on other

grounds*, 430 F.3d 600 (2d Cir. 2005) (Court found debtor not "honest but unfortunate" based on

her status as a financial professional married to a financial professional who did not disclose non-

debtor spousal contributions, made monthly luxury trips to California or China, vacationed in

Paris, enjoyed luxury restaurant dining four nights a week, spent an additional $18,000 per year

for holistic food, and made $20,000 per year contributions to the Church of the Movement of

Spiritual Inner Awareness in California); *Haesloop v. United States*, No. 197-17172-575, 2000 WL

1607316, at *5 (Bankr. E.D.N.Y. Aug. 30, 2000) (Debtor paid no taxes, while paying for an ivy

league tuition, maintaining a country home, and refusing to disclose personal expenses and wife's

assets and income).

25.     Based upon time sheets Koch provided to the IRS, the IRS argues that the
Koch stalled the IRS collection activity to delay filing bankruptcy to obtain the maximum tax
benefit from a Chapter 7 filing. The IRS argues that in addition, Koch designating the Debtors'
tax for payments to the tax years that would be most beneficial to the Debtors. But the IRS cited
no authority for finding tax evasion based upon the timing of a bankruptcy filing, or the
designation of tax payments. Such conduct is legal. It is tax avoidance, not tax evasion. If it were
tax evasion, the IRS could re-designate tax payments, and there would be law requiring taxpayers
to time any bankruptcy filing to minimize tax benefits. Either way, there is no evidence that the
Debtors had any involvement in Koch's conduct. Based upon the affidavit of John O'Donnell, he
wanted a payment plan to succeed. If Koch concocted a plan the Court deems nefarious, the
Debtors did not knowingly participate in it.

26.     Lacking any direct support for its argument, the only authority the IRS
cited to equate the Debtors payment plan proposals and designation of tax payments with tax
evasion was the case of the tax attorney in *In re Colish* 289 B.R. 533 cited above who, being a tax
attorney, obviously knew what he was doing when he made only token payments over the years,
while hiding his assets, and *In re Mitchell*, 633 F.3d 1319, 1329 (11th Cir. 2011) (no tax
payments made while debtor purchased house in his wife's name, and transferred real estate
business to wife's name, purchased three vacation timeshares, donated $81,000 to church, then
obtained offer in compromise and quickly defaulted).

27.     Even if there was a legal basis for the IRS argument, the factual basis is
Koch's records of legal advice he allegedly gave the Debtors. But the Debtors did not waive their
attorney client privilege so the records are inadmissible. In that regard, the IRS misplaces its

11

reliance on *In re Steinhardt Partners*, L.P. 9 F.3d 230 (2nd Cir. 2002) and *In re Natural Gas*

*Commodity Litigation*, 299 F.R.D. 82 (S.D.N.Y. 2005) (District Court ordered inadvertently

produced documents returned because it gave the other side an unfair advantage).

28.    In *Steinhardt Partners* 9 F.3d at 234-5, the Second Circuit addressed the

work product privilege and held that generally, turnover of work product is protected to protect

clients from prejudice arising from their lawyer's thought processes:

> The logic behind the work product doctrine is that opposing counsel should not
> enjoy free access to an attorney's thought processes. *Hickman v. Taylor*, 329 U.S.
> 495, 511, 67 S.Ct. 385, 1958, 91 L.Ed. 451 (1947); *In the Matter of Grand Jury
> Subpoenas*, 959 F.2d 1158, 1166–67 (2nd Cir.1992). An attorney's protected
> thought processes include preparing legal theories, planning litigation strategies
> and trial tactics, and sifting through information. *See Hickman*, 329 U.S. at 511,
> 67 S.Ct. at 1958. "At its core, the work product doctrine shelters the mental
> processes of the attorney, providing a privileged area within which he can analyze
> and prepare his client's case." *United States v. Nobles*, 422 U.S. 225, 238, 95
> S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975). "[T]he doctrine grants counsel an
> opportunity to think or prepare a client's case without fear of intrusion by an
> adversary." *235 In re Six Grand Jury Witnesses*, 979 F.2d 939, 944 (2d
> Cir.1992), *cert. denied*, 509 U.S. 905, 113 S.Ct. 2997, 125 L.Ed.2d 691 (1993).

Following *Steinhardt*, the IRS should not be allowed to prejudice the Debtors based upon Koch's

thought processes, particularly since (a) the Debtors have disclaimed knowledge or

understanding of Koch's advice, and (b) Koch is deceased and cannot clarify his statements, and

as such, the records are inadmissible as hearsay. *U.S. v. Heyward* 729 F.2d. 297 (4th Cir. 1997);

*Small v Heywood-Wakefield Co.* 13 F.Supp. 825 (D. Mass 1936).

29.    In summary, the Court should decline the IRS demand to find tax evasion

in these circumstances. Since the Debtors paid 75% of the tax due for the subject period, and

100% for the two of the tax years in dispute, the Court should credit the Debtors' explanation that

they believed withholding taxes would cover their tax obligations, and find that the Debtors'

conduct does not compare to the conduct of the debtors in the cases the IRS cited.

30.      Dr. O'Donnell's affidavit describes some misfortunes he and his family

suffered since 1997. Although the Debtors made considerable money in many of those years, his

affidavit shows that even high earners can be "honest but unfortunate," entitling them to a

discharge under the Bankruptcy Code. The Debtors respectfully request that the Court deny

summary judgment to the IRS and grant summary judgment to the Debtors.

### THERE IS NO BASIS FOR THE IRS' LEGAL ARGUMENT THAT THE DEBTORS DID NOT FILE TAX RETURNS

31.      Section 523(a)(1)(A) excepts from discharge debt[s] from taxes of a kind

described in section 507(a)(8). Section 507(a)(8), in turn, gives priority to income taxes "for

which a return, if required, is last due, including extensions, after three years before the date of

the filing of the petition." The combined effect of these two provisions is to except from discharge

any income taxes for which a return was due within the three years prior to the bankruptcy filing.

*Console v. C.I.R.*, 291 Fed.Appx. 234, 237 (11th Cir. 2008).

32.      There are three key requirements for discharging tax obligations: the

three-year rule in section 507(a)(8); the 240-day rule; and the two-year rule. The three-year rule,

under 11 U.S.C. section 507(a)(8)(A)(i), provides that the tax at issue must be at least three years

old. This three-year period is calculated from the most recent date the tax return was due for the

tax year, including any filed extensions. The 240-day rule, under 11 U.S.C. §507(a)(8)(A)(ii),

states that this tax must have been assessed more than 240 days before the bankruptcy petition

13

was filed. Finally, under the two- year rule, under 11 U.S.C. §523(a)(1)(B)(ii), the tax return must have been filed at least two years prior to the petition date.

33.    Until relatively recently, the two-year rule had routinely been interpreted to permit the discharge of taxes if: (1) a debtor had filed a tax return, even if late; (2) the tax return had been on file for at least two years before the filing of the bankruptcy petition, and (3) all of the other bankruptcy discharge rules were met (e.g., no fraud, no evasion, etc.).

34.    Prior to enactment of the BAPCPA in 2005, the term "return" was undefined by the Bankruptcy Code. As a result, many courts, including the Court of Appeals for the Ninth Circuit adopted the four-element test developed by the tax court in *Beard Commissioner,* 82 T.C. 766 (1984), *aff'd per curiam,* 793 F.2d 139 (6th Cir.1986), to determine what constitutes a tax "return" for §523(a)(1)(B). *Colsen v. United States (In re Colsen)*, 446 F.3d 836, 839 (8th Cir. 2006); *In re Payne,* 431 F.3d 1055, 1057 (7th Cir.2005); *Moroney v. United States (In re Moroney),* 352 F.3d 902, 905 (4th Cir.2003); *United States v. Hindenlang (In re Hindenlang)*, 164 F.3d 1029, 1033–34 (6th Cir.1999).

35.    Relying on Supreme Court precedent, the tax court in *Beard* set forth the requirements for a valid tax return (the "*Beard* Test"). Under the *Beard* Test, a document submitted to the IRS by a taxpayer qualifies as a return if it: (1) purports to be a return; (2) is executed under penalty of perjury; (3) contains sufficient data to calculate the tax liability; and (4) represents an honest and reasonable attempt to satisfy the tax law. *Beard v. Commissioner,* 82 T.C. at 777. In pre-BAPCPA nondischargeability cases, the dispute generally focused on the fourth *Beard* Test element, and the courts tended to disagree on whether this "honest-and

14

reasonable-attempt" inquiry incorporates the debtor's delinquency (i.e., whether the tax return was untimely filed and the reasons for its untimeliness) or is limited to the face of the purported return (i.e., the form and content of the documents filed). *Compare Colsen,* 446 F.3d at 840 (considering face of the documents only), *and Payne,* 431 F.3d at 1061–62 (Easterbrook, J., dissenting), *with Payne,* 431 F.3d at 1057–58 (majority opinion) (considering timeliness of the return), *Moroney,* 352 F.3d at 906, *and Hindenlang,* 164 F.3d at 1034–35.

36.    The clear majority view of pre-BAPCPA cases held that filing a proper tax return started the 2-year period for determining dischargeability of the debt upon the filing. *In re Savage*, 218 B.R. 126 (BAP 10th Cir. 1998); *In re Nunez*, 232 B.R. 778 (BAP 9th Cir. 1999); *In re Klein*, 312 B.R. 443 (S.D. Fla. 2004); *In re Payne*, 331 B.R. 358 (N.D. Ill. 2005); *In re Colsen*, 311 B.R. 765 (Bankr. N.D. Ia. 2004); *In re Izzo*, 287 B.R. 158,162 (Bankr. E.D. Mich. 2002); *In re Crawley*, 244 B.R. 121 (Bankr N.D. Ill. 2000); *In re Pierchoski*, 243 B.R. 267 (W.D. Pa. 1999), *rev'd and rem'd, In re Pierchoski*,220 B.R. 20 (Bankr. W.D. Pa. 1998); *In re McGrath*, 217 B.R. 389 (Bankr. N.D. N.Y. 1991).

37.    With enactment of the BAPCPA in 2005, Congress attempted to clarify the meaning of the term "return" by adding a "hanging paragraph" to the end of section 523(a) (the "Hanging Paragraph"). *In re Martin*, 508 B.R. 717, 724 (Bankr. E.D. Cal. 2014), *vacated and remanded*, 542 B.R. 479 (B.A.P. 9th Cir. 2015), (citing BAPCPA, Pub.L.No. 109-8, § 714, 119 Stat. at 128–29). This Hanging Paragraph provides:

> [f]or purposes of this subsection, the term "return" means a return that *satisfies the* requirements of applicable nonbankruptcy law (including applicable filing *requirements).* Such term includes a return prepared pursuant to section 6020(a) of the Internal Revenue Code of 1986, or similar State or local law, or a written stipulation to a judgment or a final order entered by a nonbankruptcy tribunal, but

does not include a return made pursuant to section 6020(b) of the Internal Revenue Code of 1986, or a similar State or local law.

§ 523(a) para. (emphasis added).

38.    The Debtors submit that the Hanging Paragraph adopts, by reference, the the four (4) part *Beard* test, as articulated by the United States Tax Court in *Beard v. Commissioner*, 82 T.C. 766 (1984) aff'd, 793 F.2d 139 (6th Cir. 1986); and it clarifies the law as to what does not constitute a return i.e., a 26 U.S.C. § 6020(b) document prepared by IRS. Specifically, by incorporating the reference to "applicable nonbankruptcy law," Congress expressed its intent to codify the majority rule of pre BAPCPA case law. *Rhodes v. United States (In re Rhodes)*, 498 B.R. 357, 369 (Bankr.N.D.Ga.2013).

**(a) Although the IRS cites the one-day-late rule, the IRS does not support the one-day-late rule, and the Court should reject the rule as well**

39.    Congress' attempt in BAPCPA to bring clarity to the issue of when a tax return is filed has resulted in disagreement among the courts.

40.    The Internal Revenue Code ("IRC") requires taxpayers to file income tax returns by the fifteenth of April each year for the preceding taxable year, unless they have filed for an extension. Analyzing the text of the IRC, some courts reasoned that the "applicable filing requirements" includes the requirement that the return be timely filed. These courts thus conclude that any late filed return does not comply with the IRC's filing requirements, and therefore does not constitute a "return" under nonbankruptcy law for section 523(a)(1)(B)(i). *E.g. In re: Fahey,* 779 F3d 1, 4-11 (1st Cir. 2015) (interpreting state law); *McCoy v. Miss. State Tax Comm'n (In re McCoy)*, 666 F.3d 924, 929–30(5th Cir. 2012), *cert. denied*, 113 S.Ct. 192 (2012); *Casano v. IRS*

(In re: Casano), 473 B.R. 504, 507 (Bankr. E.D.N.Y.), *Creekmore v. Internal Revenue Service (In re Creekmore)*, 401 B.R. 748 *(*Bankr. N.D.Miss. 2008).

41.    Courts have criticized the draconian result of this line of cases, noting it does "too much violence to the statute." *E.g. In re: Briggs*, 511 B.R. at 714 (*quoting Brown v. Mass. Dep't of Revenue (In re Brown)*, 489 B.R. 1, 5–6 (Bankr.D.Mass.2013) *aff'd sub nom. Gonzalez v. Mass. Dept. of Rev. (In re Gonzalez)*, 506 B.R. 317 (1st Cir. BAP 2014) *and aff'd*, 2014 WL 1815393 (1st Cir. BAP Apr. 3,2014). These courts conclude that the "applicable filing requirements" address the form and content of a filing rather than the timeliness of its filing. *In re: Briggs, 511 B.R. at 714 (*citing *In re Gonzalez*, 506 B.R. at 328 ("[T]he definition of 'return' in the 'hanging paragraph,' Section 523(*), appears to be grounded on what is filed rather than when it is filed because it specifically includes a late filed return under Section 6020 of the Internal Revenue Code.").

42.    In addition, it is impossible to harmonize the one-day late interpretation with the hanging paragraph's second sentence. *In re Martin*, 508 B.R. at 727 (citing *In re: Wogoman*, 475 B.R. at 248–49. The one-day late result requires reading the hanging paragraph's first sentence in isolation and without regard to the second sentence. *In re Martin*, 508 B.R. at 727 (citing *In re: Wogoman*), 475 B.R. at 248). As explained by the *Martin* Court:

> if the first sentence of the hanging paragraph is construed to support the one day late result (i.e., excluding any late filed document from the definition of a "return"), then that interpretation is internally inconsistent with the second sentence's reference to an IRC § 6020(a) return, and it also renders the second sentence's reference to an IRC §6020(b) return meaningless. This is because returns filed pursuant to both IRC §§6020(a) and 6020(b) are necessarily "late" returns. The IRS would not even prepare these "substitute" returns until some time after the taxpayer has failed to timely file his or her own return (i.e., once the April 15 statutory deadline has passed). *See* IRC §6020(a), *728 (b)(1); *I.R.S.*

09-01486-mkv    Doc 48-4    Filed 01/10/18    Entered 01/10/18 20:01:30    Memorandum of
Law in Support of Motion    Pg 18 of 25

> *Chief Couns. Notice* CC–2010–016, 2010 WL 3617597 (Sept. 2, 2010) (noting
> that an IRC § 6020(b) return "is always prepared after the due date") ….
>
> Thus, it is contradictory to impose *McCoy's* strict temporal condition in the
> definition of "return," while including a necessarily late IRC § 6020(a) return as
> one of those "returns." By the same logic, there is also no need for the hanging
> paragraph to specifically exclude a necessarily late IRC § 6020(b) return if the
> general definition of "return" in the first sentence already excludes all late filed
> returns. Conversely, if the first sentence of the hanging paragraph is interpreted to
> not impose a temporal condition in the definition of a tax return, then the first and
> second sentences of the hanging paragraph can be read in harmony with one
> another. The hanging paragraph would be internally consistent, and neither
> sentence would render the other meaningless.

*In re Martin*, 508 B.R. at 727 (*citing Bayview Hunters Point Cmty. Advocates v. Metro. Transp.*

*Comm'n*, 366 F.3d 692, 700 (9th Cir.2004).

43.      Additionally, Congress addressed the "time of filing" question in another

manner, which further supports the conclusion that timely filing is not a "requirement" in the

hanging paragraph. Specifically, the Bankruptcy Code addresses the effect of a late filed return in

section 523(a)(1)(B)(ii). Therefore, the One Day Late Rule would render section 523(a)(1)(B)(ii)

meaningless. *In re: Martin,* 508 B.R. at 728 (*citing In re: Rhodes,* 498 B.R. at 366).

44.      Under section 523(a)(1)(B)(ii), a tax debt is not discharged if a return was

filed after its due date (i.e., it was untimely) and within two years prior to the bankruptcy filing.

To define "return," the definition in the Hanging Paragraph applies to both subsections (i) and (ii)

of 523(a)(1)(B). *In re Martin*, 508 B.R. at 728 (citations omitted). "However, if the hanging

paragraph is interpreted to make timely filing a requirement in the definition of a tax return, thus

excluding all returns that are not filed on time, then a creditor has no need to ever resort to the two

year rule long recognized in § 523(a)(1)(B)(ii)." *Id.* at 728-29 (citations omitted). *See e.g. In*

*re:Briggs, 511 B.R. at 715; In re: Rhodes,* 498 B.R. at 366 ("Thus, if timeliness is part of

'applicable filing requirements' ..., a late filed return is not a 'return' for clause (ii) of § 523(a)(1)(B) either.").

45.     The IRS adopts this argument as at page 28 of its Memorandum of Law, arguing that the One Day Late Rule "fails to harmonize §523 as a whole, particularly since the statute contemplates that some late-filed forms are 'returns.'" *Citing Chief Counsel Notice* 2010-16, 2010 WL 3617597 (Sept. 2, 2010).

46.     The IRS should not be permitted to publicly claim in its brief Chief Counsel Notice and in its summary judgment motion, that the One Day Late Rule makes no sense, while simultaneously subverting that position with a wink and a nod, suggesting that this Court should adopt the rule.

47.     In summary, because the One Day Late Rule would (1) make it impossible to read the first and second sentences of the hanging paragraph in harmony, and (2) render § 523(a)(1)(B)(ii) superfluous, this Court should not adopt the One Day Late Rule, and instead, should conclude that timely filing is not a "requirement" for determining what constitutes a tax "return" for dischargeability purposes. *E.g. In re Martin*, 508 B.R. at 729.

**(b)  The IRS Right to Payment Accrued When the Taxes Became Due, Not When the IRS Formally Assessed the Debt**

48.     Instead of the *Beard* test or the one-day late rule, the IRS' official position is that the status of its collection efforts should dictate whether a tax debt is nondischargeable. The IRS' argues that the Debtors' tax debt is nondischargeable under section 523(a)(1)(B)(i) because the underlying "debt" was established by the IRS's assessments, rather than the tax

returns the Debtors subsequently filed. The IRS attempts to force a distinction between a tax

liability based upon an assessment and a tax liability based upon a subsequently filed tax return.[1]

     49.    The IRS posits that an IRS assessment creates a legally enforceable "debt"

that carries the force of a judgment, and renders a subsequently filed tax return a nullity. If courts

accept the IRS's argument, then there would be no need for a court to ever determine whether a

post assessment tax return qualifies as a "return" within the meaning of section 523(a)(1)(B) and

the Hanging Paragraph. The subsequently filed tax return would be irrelevant because the

"assessed debt" would independently constitute a tax debt "with respect to which a return . . . was

not filed or given." § 523(a)(1)(B)(i).

     50.    The IRS has cited only one case to support this position. *Wogoman v. IRS
(In re Wogoman)* 2011 WL 3652281, (Bankr. D.Colo. Aug. 19, 2011), aff'd on other grounds, 475

B.R. 239 (10th Cir. BAP 2012). But several courts have disagreed with the IRS on this issue

under nearly identical facts. *See, In re: Briggs*, 511 B.R .at 712; *In re Martin*, 508 B.R. at 725; *In

re: Rhodes*, 498 B.R. at 362; *see also Savage v. IRS (In re Savage)*, 218 B.R. 126,132 (10th Cir.

BAP 1998) (pre BAPCPA). The bankruptcy court in *Rhodes* identified a fatal flaw in the IRS's

argument:

> The statutory definitions of "debt" and "claim" focus on the nature and source of
> the debt (federal income tax liability), not the mechanism to determine the debt
> (assessment versus return). Under these definitions, a debtor has a "debt" when a
> right to payment accrues, regardless of how or when the extent of the debtor's
> liability becomes fixed or due. At the end of each [taxable year], the United States
> had a right to payment of income tax for [the] year (although unmatured and
> unfixed), and the Debtor was liable for the tax at the time. Thus, the Debtor had a

---

[1] Here, the Debtors filed their returns before the IRS made an assessment for year 2000 through 2004. Thus, even
under the IRS Rule, the Debtors are at least entitled to a discharge for years 2000 through 2004.

> debt that existed regardless of the Debtor's filing of the return or the IRS's assessment. The distinction between assessment and return is not relevant to the existence of a "debt" for bankruptcy purposes or to the dischargeability inquiry under §523(a)(1)(B).

*In re: Rhodes*, 498 B.R. at 362. 498 B.R. at 362 ; *cf. Edelson v. Comm'r*, 829 F.2d 828, 834 (9th Cir.1987) ("[T]ax liabilities, though unassessed, are deemed obligations due and owing at the close of the taxable year.").

51.     The IRS' position is incorrect since it "conflates the right to payment with the right to *collect* payments." *In re: Briggs*, 511 B.R. 707, 712 (Bankr. N.D.Ga. 2014). At the end of the 1997 tax year, the IRS had a right to payment of the Debtors' income taxes, and the Debtor was liable when the taxes became due, April 15, 1998. The same holds true for later years. The Debtors' underlying debt to the IRS, although unfixed existed and was enforceable regardless of when the IRS later assessed the debt or when the Debtor filed his late return. *See*, *In re: Martin*, 508 B.R. at 725 (citing *In re: Rhodes*, 498 B.R. at 362). That the IRS did not have the right to collect on the debt until it was formally assessed does not change the fact that the right to payment existed. *See In re: Briggs,* 511 B.R. at 712.

52.     The IRS Rule lacks any logical basis to distinguish between returns filed or given pre-assessment versus returns filed or given post tax assessment. There is no language in section 523, the Legislative History of section 523(a), or elsewhere that Congress intended to determine a debtor's eligibility for a discharge based upon if or when the IRS determined a taxpayer's liabilities under its authority under 26 U.S.C. §6020(b). If this was Congress' intent it could have drafted section 523(a) to so state; and clearly it would have warranted a mention in the Legislative History to section 523(a).

53.     In *In re: Martin*, that Court also noted that other than the statutory
restriction in IRC § 6213(a), which compels the IRS to wait 90 days after mailing the deficiency
notice before making its assessment, the IRS appears to have unfettered discretion in deciding
when to initiate the assessment process (once those 90 days have run). With this discretion, the
IRS could mail a deficiency notice to a debtor, who did not file his or her tax return by the April
15 due date, on the next day, April 16, and assess the debtor's tax liability on the 91st day after
that. Under the post assessment approach [the IRS' Rule], the tax debt would hypothetically
become nondischargeable even if the debtor otherwise made a reasonable attempt to file his or her
return 92 days after the April 15 due date, but one day after the IRS has made its assessment. But
a return filed years after its due date, as had occurred here, would be treated as a return for
dischargeability purposes if the IRS has not yet made its assessment. The post assessment
approach [the IRS' Rule] is simply too arbitrary in its application and grants too much power to
the IRS to control the timing of the dischargeability issue." *In re: Martin*, 508 B.R. at 730-731

54.     Because of the policy to strictly construe dischargeability exceptions
against the creditor, this Court should decline to adopt the IRS' Rule, which would provide for a
definition of "return" that essentially puts the dischargeability "trigger" entirely in the hands of
the IRS creditor. *See In re: Martin*, 508 B.R. at 730. Although the IRS' Rule focuses on one
particular date to determine whether a return has been filed, the date that IRS makes an
assessment, "that date is a moving target that is ultimately controlled by the IRS." *Id*.

55.     For all these reasons, this Court should not adopt the IRS Rule for its
definition of a tax return for dischargeability purposes.

**(c)  This Court Should Follow the Line of Cases Which Continues to Apply the Beard
Test**

56.    The Debtor submits that post BAPCPA the *Beard* Test, or a close

variation thereon, still represents the "applicable nonbankruptcy law" referred to in the Hanging

Paragraph (the "No-Time-Limit Rule"). See, *In re: Briggs*, 511 B.R. 707, 716-719 (Bank. N.D.

Ga. 2014); *In re Martin,* 508 B.R. at 731*; In re Rhodes*, 498 B.R. at 369 (adopting *Colsen* version

of *Beard* Test); *Brown v. Mass. Dep't of Revenue* (In re Brown), 489 B.R. 1, 5–6

Bankr.D.Mass.2013), aff'd on other grounds sub nom. *Gonzalez*, 506 B.R. 317. These courts, in

cogently analyzing section 523(a) and the Hanging Paragraph, rejected the One Day Late Rule

and the IRS' Rule as contradicting the *Beard* test, and found that whether or not an IRS tax

assessment is made is irrelevant. The Court should focus on the tax returns themselves in

determining whether the fourth *Beard* factor has been met.

57.    Under the No Time Limit Rule, the *Beard* Test is part of the "applicable

nonbankruptcy law" referenced in the Hanging Paragraph. *E.g. In re Martin,* 508 B.R. at 731; *In

re: Briggs*, 511 B.R. at 716-719. These courts have rejected what they termed a "temporal

restriction." *E.g. In re Martin,* 508 B.R. at 731; *In re: Briggs*, 511 B.R. at 716-719. The

conclusion that that the fourth *Beard* criterion contains no mention of timeliness was reached by

the Court of Appeals for the Eighth Circuit in *In re: Colsen*, 446 F.3d 836, 840 (8th Cir. 2006).

The No Time Limit Rule represents the better analysis of the original *Beard* Test that more

closely follows the actual requirements of applicable nonbankruptcy law (including filing

requirements) that make a return a "return." *In re Martin,* 508 B.R. at 731 (quoting *In Re: Rhodes*,

498 B.R. at 369).

58.    Therefore, the fact that the Debtors filed their Form 1040s after the IRS
made its assessments is irrelevant in the court's application of section 523(a)(1)(B)(i).

59.    It bears reiterating that a filing that satisfies the *Beard* test of what
constitutes a "return" must: (1) purport to be a return; (2) be executed under penalty of perjury;
(3) contain sufficient data to allow calculation of tax; and (4) represent an honest and reasonable
attempt to satisfy the requirements of the tax law. *Beard*, 82 T.C. at 766.

60.    Here, the Debtors' late filed returns purported to be returns and were
executed under penalty of perjury. As a result of the IRS' receipt of the returns, the IRS increased
the tax due for tax year 1999 by $17,786, for tax year 1998 by $14,173, and for 1997 by $2,809.

61.    These additions demonstrate that the information contained in the late
filed returns was sufficiently reliable to allow the IRS to increase the Debtors' tax liability.

62.    Scrutiny of the Debtors' late filed return under the *Beard* test turns on the
fourth element of the test, whether the return is "an honest and reasonable attempt to satisfy the
tax laws."

63.    In both the IRS' and Debtors' undisputed statement of facts in support
their respective motions for summary judgment, the IRS accepted the Debtors' late filed Form
1040s and increased their tax liability accordingly. Besides the fact, the Debtors had already paid
75% of their taxes, such increases show that the Debtors' filings were an "honest and reasonable
attempt to satisfy the tax laws." This Court should conclude that the Debtors have demonstrated,
as a matter of law, that their 1997 through 2003 tax filings are "returns", within the meaning of
section 523(a).

## CONCLUSION

This Court should (a) find that the Debtors' Form 1040 tax returns for the years 1997 through 2004 were "returns" within the meaning of section 523(a)(1)(B)(i) and section 523(a)'s hanging paragraph, (b) that the Debtors 25% underpayment is not conduct consistent with tax evasion, and (c) if their conduct can be deemed to be consistent with tax evasion, such conduct does not satisfy the Second Circuit's *mens rea* requirement.

The Debtors respectfully request that this Court deny the IRS's Motion for Summary Dismissing the Complaint, and instead enter judgment for the Debtors, declaring that their 1997 through 2003 federal income tax debts were discharged in this chapter 7 bankruptcy case.

Dated: New York, New York
      January 10, 2018

BACKENROTH FRANKEL & KRINSKY, LLP

By:    s/ Mark Frankel
        800 Third Avenue
        New York, New York  10022
        (212) 593-1100

25